UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| CHATOM MOTOR COMPANY, INC. individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. CV-17-00120 |
| FCA US, LLC: FIAT CHRYSLER AUTOMOBILES, N.V. ROBERT BOSCH GMBH, and Robert Bosch LLC, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff , CHATOM MOTOR COMPANY, INC., for itself and all others similarly situated, brings this action against Fiat Chrysler Automobiles N.V., FCA US LLC, Robert Bosch GmbH, and Robert Bosch LLC (collectively, "Defendants") and alleges the following:

### INTRODUCTION

1.    FCA US LLC is a wholly-owned subsidiary of Fiat Chrysler Automobiles N.V. (collectively, these two defendants are referred to herein as "FCA"). Robert Bosch LLC is a wholly-owned subsidiary of Robert Bosch GmbH (collectively, these two defendants are referred to herein as "Bosch"). From at least 2007 to the present, FCA has manufactured and sold cars in the United States. Many vehicles manufactured by FCA have engines designed and/or manufactured by Bosch, including the EcoDiesel versions of vehicles like the Dodge Ram 1500 and Jeep Grand Cherokee.

2.    In an effort to appeal to environmentally-conscious consumers, FCA markets its "EcoDiesel" line of vehicles as "clean diesel." FCA advertises that its "EcoDiesel" vehicles have many environmentally-friendly qualities, including ultra-low emissions, high fuel

efficiency, powerful torque, and high towing capacity. Consumers relied on these representations in deciding whether to purchase or lease FCA's EcoDiesel vehicles. Similarly, dealerships, including Plaintiff, Chatom Motor Company, Inc., relied on FCA and Bosch's false representations in deciding whether to purchase the "EcoDiesel" line of vehicles or accept the vehicles as trade-ins for their dealership, as well as whether to sell those vehicles to their customers.

3.     FCA charges a considerable price premium for its EcoDiesel vehicles. For example, the Manufacturers Suggested Retail Price ("MSRP") for a new 2016 Jeep Grand Cherokee Limited with the standard engine is $38,560.[1] Adding the EcoDiesel option increases the MSRP by $4,500 to $43,060.[2] Similarly, the MSRP for the standard model 2016 Ram 1500 Crew Cab SLT is $38,575,[3] but increases by $4,270 to $43,345 when the EcoDiesel engine is added.[4]

4.     It was recently revealed that rather than designing and manufacturing the EcoDiesel vehicles with low emissions, high fuel economy, and powerful torque and towing capacity as promised, FCA and Bosch instead devised software that makes the EcoDiesel vehicles *appear* to function as advertised while under testing conditions. FCA and Bosch installed this software on various makes and models under the "EcoDiesel" brand. The software enabled the emissions control system when the vehicle was driving under emissions testing conditions, but disabled the emissions control system under normal driving

---

[1]     *2016 Jeep Grand Cherokee Pricing*, Kelley Blue book, https://www.kbb.com/jeep/grand-cherokee/2016/limited/?vehicleid=415243&intent=buy-new&options= (last accessed March 13, 2017).

[2]     *2016 Jeep Grand Cherokee Pricing* (with EcoDiesel option selected), Kelley Blue book, https://www.kbb.com/jeep/grand-cherokee/2016/limited/?vehicleid=415243&intent=buy-new&options=7039022|true (last accessed March 13, 2017).

[3]     *2016 Ram 1500 Crew Cab Pricing*, Kelley Blue book, https://www.kbb.com/ram/1500-crew-cab/2016/slt/?vehicleid=415017&intent=buy-new&category=pickup&options= (last accessed March 13, 2017).

[4]     *2016 Ram 1500 Crew Cab Pricing* (with EcoDiesel option selected), Kelley Blue book, https://www.kbb.com/ram/1500-crew-cab/2016/slt/?vehicleid=415017&intent=buy-new&category=pickup&options=7006177|true (last accessed March 13, 2017).

conditions on roads and highways. The software allows emissions levels to increase far above allowable levels, especially while driving at a high speed or for an extended period of time.

5.     The emissions control technology in these vehicles limits illegal emissions to allowable levels under state and federal regulations by reducing the vehicle's performance. Rather than finding a way to improve performance while maintaining the emissions control system, FCA and Bosch instead decided to hide the fact that the emissions control system decreases vehicle performance. To do so, they designed software that *only* switches on the full emissions control system when the software detects that the vehicle is undergoing emissions testing. When the vehicle is not undergoing emissions testing, the emissions control system is automatically switched off. As a result, FCA's vehicles achieve the high performance promised, but produce several times the allowable standard for pollution.

6.     According to a Notice of Violation issued by the U.S. Environmental Protection Agency ("EPA"), FCA and Bosch installed this software on at least the following EcoDiesel models of its vehicles: Model Year 2014–2016 Dodge Ram 1500 and Model Year 2014–2016 Jeep Grand Cherokee (collectively, the "Affected Vehicles"). According to the Notice of Violation, at least 100,000 Affected Vehicles were sold in the United States. EPA and other investigations are ongoing, and additional models and model years may be added to this list as new facts are discovered.

## PARTIES

7.     Plaintiff, Chatom Motor Company, Inc.  is a Chevrolet dealership located in Chatom, Alabama. Plaintiff and class members (defined below) are automobile dealers that acquired Affected Vehicles for the purpose of resale and had those vehicles in their inventory on or after January 12, 2017. Plaintiff and class members have been unable to sell the vehicles, or have only been able to do so at a loss.

8.     FCA US LLC is a corporation doing business in every U.S. state and the District of Columbia. FCA US LLC is organized under Delaware law, and its principal place of business is 1000 Chrysler Drive, Auburn Hills, Michigan 48326. FCA US LLC is a wholly-owned subsidiary of Fiat Chrysler Automobiles N.V.

9.     Fiat Chrysler Automobiles N.V. is a foreign corporation. It is headquartered in London, United Kingdom. Fiat Chrysler Automobiles N.V. is the parent company of FCA US LLC. Fiat Chrysler Automobiles N.V. sells vehicles in the United States through its subsidiary FCA US LLC. Fiat Chrysler Automobiles N.V., directly and/or through its United States subsidiary FCA US LLC, at all material times, designed, manufactured, and supplied elements of the Affected Vehicles. Fiat Chrysler Automobiles N.V. is subject to the personal jurisdiction of this Court because it has availed itself of the laws of the United States through its management and control over FCA US LLC, and over the design, development, manufacture, distribution, testing, and sale of hundreds of thousands of Affected Vehicles sold or leased in the United States.

10.     Robert Bosch LLC is a corporation doing business in every U.S. state and the District of Columbia. Robert Bosch LLC is organized under Delaware law, and its principal place of business is 38000 Hills Tech Drive, Farmington Hills, Michigan 48331. Robert Bosch LLC is a wholly-owned subsidiary of Robert Bosch GmbH.

11.     Robert Bosch GmbH is a multinational engineering and electronics company headquartered in Gerlingen, Germany. Robert Bosch GmbH, directly and/or through its North-American subsidiary Robert Bosch LLC, at all material times, designed, manufactured, and supplied elements of the defeat device to FCA for use in the Affected Vehicles. Bosch GmbH is subject to the personal jurisdiction of this Court because it has availed itself of the laws of the United States through its management and control over Robert Bosch, LLC, and over the design, development, manufacture, distribution, testing, and sale of hundreds of thousands of the defeat devices installed in the Affected Vehicles sold or leased in the U.S.

12.     At all relevant times, FCA and Bosch manufactured, distributed, sold, leased, and warranted the Affected Vehicles under the Dodge and Jeep brands throughout the United States. FCA, Bosch, and/or their agents designed the EcoDiesel engines and engine-control systems in the vehicles, including the "defeat device" software. FCA and Bosch also developed and distributed the owners' manuals, warranty booklets, and other promotional materials relating to the vehicles.

## TOLLING

1.      For the following reasons, any otherwise applicable statutes of limitations have been tolled by the discovery rule with respect to all claims.

2.      Plaintiff Chatom Motor Company, Inc. and members of the proposed class could not have discovered that FCA and Bosch were concealing and misrepresenting the true emissions levels or FCA and Bosch's use of "defeat devices" through the exercise of reasonable diligence.

3.      FCA and Bosch's deception with respect to their "EcoDiesel" engine-control systems and the included "defeat devices" was concealed from consumers, dealers, and regulators. The EPA initially discovered FCA and Bosch's "defeat device" software when the Volkswagen investigation prompted the EPA to expand vehicle testing to look for other defeat devices. The EPA has reported that FCA failed to disclose this software to regulators.

4.      Plaintiff and other class members could not have reasonably discovered, and did not know of facts that would have caused a reasonable person to suspect, that FCA and Bosch intentionally concealed this information from federal and state authorities, dealers, and consumers. Additionally, a reasonable and diligent investigation could not have revealed FCA and Bosch's deception, which was discovered by Plaintiff Chatom Motor Company, Inc., immediately before this action was filed.

5.      Plaintiff's claims are also tolled due to FCA and Bosch's fraudulent concealment.

6.      Instead of disclosing its deception, FCA and Bosch falsely represented to federal and state authorities, dealers, and consumers that its vehicles complied with applicable federal and state emissions standards, and that FCA and Bosch was reputable manufacturers whose representations could be trusted. FCA and Bosch knowingly, actively, and fraudulently concealed and denied the facts alleged in this Complaint.

7.      Plaintiff's claims are also tolled by the doctrine of estoppel. FCA and Bosch were under a continuous duty to disclose to Plaintiff Chatom Motor Company, Inc. and the other

class members the relevant facts that they knew about the "defeat devices," vehicle emissions, and the vehicles' failure to comply with federal and state laws.

8.      Although FCA and Bosch had a duty throughout the relevant time period to disclose to Plaintiff Chatom Motor Company, Inc. and class members that it had engaged in the deception described in this complaint, FCA and Bosch instead chose to evade federal and state emissions and clean air standards with respect to the Affected Vehicles. FCA and Bosch also intentionally misrepresented their lack of compliance with these standards, as well as laws regulating vehicle emissions and clean air. Thus, FCA and Bosch are estopped from relying on any statutes of limitations in defense of this action.

**JURISDICTION**

9.      This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). At least one class member (Plaintiff, Chatom Motor Company, Inc.) is of diverse citizenship from Defendants, there are more than 100 class members, and the aggregate amount in controversy exceeds $5 million, before interest and costs.

10.     The Court also has personal jurisdiction over Defendants under 18 U.S.C. § 1965 because they are found or have agents or transact business in this District.

11.     The court also has jurisdiction pursuant to 28 U.S.C. § 1331 upon 18 U.S.C. § 1964.

12.     The court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

13.     This Court may exercise personal jurisdiction over FCA because FCA has sufficient minimum contacts in Alabama and purposefully avails itself of the markets in Alabama by conducting business throughout the state, including advertising, marketing, leasing, sale, and distribution of its vehicles to and through Alabama. In part because of the conduct alleged in this Complaint, Affected Vehicles ended up with both consumers and dealers in the state of Alabama.

14.     This Court may exercise personal jurisdiction over Bosch because Bosch has sufficient minimum contacts in Alabama and purposefully avails itself of the markets in

Alabama by conducting business throughout the state, including advertising, marketing, leasing, sale, and distribution of its vehicles to and through Alabama. In part because of the conduct alleged in this Complaint, Affected Vehicles ended up with both consumers and dealers in the state of Alabama.

15.    Venue is proper in this district and division under 28 U.S.C. § 1391(b) because a substantial part of FCA's acts and omissions giving rise to the allegations in this Complaint occurred in this District.  FCA and Bosch advertised, marketed, leased, sold, and distributed their vehicles to and through Alabama. In part because of the conduct alleged in this Complaint, Affected Vehicles ended up with both consumers and dealers in the state of Alabama.

## FACTS

16.    FCA and Bosch intentionally designed their EcoDiesel vehicles to evade emissions standards. To hide this fact, FCA and Bosch misled dealers, consumers, and regulators about the amount of pollution its EcoDiesel vehicles created and their fuel efficiency. White touting themselves as an environmentally-conscious companies that produced cars for consumers who care about the environment, FCA and Bosch designed, produced, and sold expensive cars that produced pollution at many times the level allowed by federal and state regulations. FCA and Bosch then intentionally and knowingly concealed the truth about those cars from regulators and consumers.

A.    **FCA and Bosch touted their "EcoDiesel" vehicles as fuel-efficient and environmentally-friendly.**

17.    FCA and Bosch have advertised their EcoDiesel vehicles as low-emission, fuel-efficient vehicles for years. For example, FCA's marketing of its EcoDiesel Jeep vehicles includes a leaf and green coloring of the word "Diesel" in its logo, which contributes to the environmentally-friendly image:[5]

---

5      *EcoDiesel*, Jeep.com, http://www.jeep.com/en/jeep-capabilities/eco-diesel-calculator/ (accessed on March 4, 2017).



The overarching theme in FCA's EcoDiesel marketing is the promise of a clean and environmentally-friendly diesel vehicle.[6]

18.    FCA and Bosch's success in marketing the EcoDiesel vehicles is based in largely on their promotion of the "clean" and "green" characteristics of these vehicles. Each of the Affected Vehicles includes the phrase "EcoDiesel" in its name.

19.    FCA's EcoDiesel marketing and advertising specifically targets consumers "who want to drive an efficient, environmentally-friendly truck without sacrificing capability or performance."[7] Marketing of the EcoDiesel vehicles touts their "reduced $CO_2$ emissions"[8] and notes that the EcoDiesel engine "offers innovative technology that is efficient, increases range and improved power – all while leaving little trace of being there."[9]

---

6    *See, e.g., The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You*, Ram Zone ("The Official Blog of Ram Trucks" operated by FCA US LLC) (July 16, 2013), https://blog.ramtrucks. com/features/the-2014-ram-1500-with-ecodiesel-engine-available-soon-at-a-dealer-near-you/ ("The 2014 Ram 1500 features an available 3.0L EcoDiesel V6 engine—for consumers who want to drive an efficient, environmentally friendly truck without sacrificing capability or performance") (July 16, 2013).

7    *The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You*, Ram Zone ("The Official Blog of Ram Trucks" operated by FCA US LLC) (July 16, 2013), https://blog.ramtrucks. com/features/the-2014-ram-1500-with-ecodiesel-engine-available-soon-at-a-dealer-near-you/ ("The 2014 Ram 1500 features an available 3.0L EcoDiesel V6 engine—for consumers who want to drive an efficient, environmentally friendly truck without sacrificing capability or performance") (July 16, 2013).

8    *EcoDiesel Ram 1500 HFE*, RamTrucks.com, http://www.ramtrucks.com /en/ecodiesel/ (accessed on March 4, 2017).

9    *EcoDiesel*, Jeep.com, http://www.jeep.com/en/jeep-capabilities/eco-diesel-calculator/ (accessed on March 4, 2017).

20.    FCA also touts its concern with sustainability and pollution and holds itself out as a protector of the environment. In its 2015 Sustainability Report, FCA stated: "FCA believes that effective, long-lasting results to address climate change can only be achieved through the combined efforts of government, energy producers, manufacturers, consumers, academia and the financial community."[10] The report goes on to note that FCA has signed several agreements related to preventing climate change, including the CEO Climate Leadership for Automotive Declaration and the Charter of Milan.[11]

21.    FCA has also promised that its EcoDiesel vehicles provide exceptional fuel economy.  According to FCA, for example, the 2014 Ram 1500 EcoDiesel "delivers an outstanding combination of best-in-class fuel efficiency 28 miles per gallon."[12] Similarly, FCA represents that the 2015 Jeep Grand Cherokee EcoDiesel "delivers a best-in-class 30 miles per gallon" fuel efficiency.[13]

22.    In addition to environmentally friendly and fuel efficient, FCA also advertised its "EcoDiesel" vehicles as high-performance. Certain performance metrics, including torque and towing capacity, are particularly important factors for truck and SUV consumers.

---

10    *Fiat Chrysler's 2015 Sustainability Report*, FCAGroup.com, http://reports.fcagroup. com/sustainability/2015/our-business-and-responsibilities/our-responsibilities/ fighting-climate-change#start (accessed on March 4, 2017).

11    *Id.*

12    *2014 Ram 1500 EcoDiesel Orders Top More Than 8,000 Units in Three Days, Filling Initial Allocation*, FCANorthAmerica.com, http://media.fcanorthamerica.com/newsrelease.do? id=15368&mid=&searchresult (accessed March 4, 2017).

13    *Jeep® Grand Cherokee EcoDiesel Named 2015 Green SUV of the Year™ by Green Car Journal*, FCA North America, http://media.fcanorthamerica.com/newsrelease.do? id=16306&mid=&searchresult (accessed March 4, 2017).

23.    For example, FCA claims that the 2014 Ram 1500 EcoDiesel delivers "unsurpassed torque and up to 9,200 pounds of towing capability."[14] FCA similarly claims that the 2015 Jeep Grand Cherokee EcoDiesel has "towing capability of 7,400 pounds."[15]

24.    Because of the purported performance, environmental, and fuel-efficient qualities FCA promoted in its EcoDiesel vehicles, in 2015 the Ram 1500 EcoDiesel was named the 2015 Green Truck of the Year by Green Car Journal.[16] Green Car Journal considers "environmental attributes alongside traditional touchstones that define what makes a great pickup, such as functionality, versatility, safety, value and style."[17] Upon receiving this award, the President and CEO of Ram Truck Brand Bob Hegbloom said "The Ram 1500 EcoDiesel is an incredible success for Ram Truck and part of the brand's long term strategy to design and engineer the best trucks you can buy with fuel economy and capability top of mind."[18] The Jeep Grand Cherokee EcoDiesel was similarly named Green Car Journal's 2015 Green SUV of the Year based on FCA's representations.[19]

------

14    *2014 Ram 1500 EcoDiesel Orders Top More Than 8,000 Units in Three Days, Filling Initial Allocation*, FCANorthAmerica.com, http://media.fcanorthamerica.com/newsrelease. do?id=15368&mid=&searchresult (accessed March 4, 2017).

15    *Jeep® Grand Cherokee EcoDiesel Named 2015 Green SUV of the Year™ by Green Car Journal*, FCA North America, http://media.fcanorthamerica.com/newsrelease.do?id=16306&mid=&searchresult (accessed March 4, 2017).

16    *Ram 1500 EcoDiesel Named 2015 Green Truck of the Year™ by Green Car Journal*, FCA North America, http://media.fcanorthamerica.com/newsrelease.do?id=16175& mid=464 (accessed March 4, 2017).

17    *Id.*

18    *Id.*

19    *Jeep® Grand Cherokee EcoDiesel Named 2015 Green SUV of the Year™ by Green Car Journal*, FCA North America, http://media.fcanorthamerica.com/newsrelease.do?id=16306&mid=&searchresult (accessed March 4, 2017).

B.    **FCA and Bosch designed software to cheat emissions tests.**

25.    Modern vehicle engines feature sophisticated computer components to manage the vehicle's operation. In diesel vehicles, this includes a component called the electronic diesel control ("EDC") that manages diesel emissions. Bosch was responsible for testing, manufacturing, and selling the EDC system used by FCA in the Affected Vehicles.

26.    Bosch and FCA worked together to create unique specifications and software code for the emissions control system to manage the vehicles' engine operation. Bosch controlled development of the Affected Vehicles' emissions control units and actively participated in the development of the defeat device.

27.    This emissions control system was developed by Bosch and FCA for use in the Affected Vehicles to evade emissions standards. Bosch and FCA designed and implemented a specific set of software algorithms for the Affected Vehicles that would allow FCA to adjust fuel consumption levels, exhaust, air pressure, and even urea injection rates based on the detected driving conditions.

28.    When vehicles are tested for compliance with EPA emission standards, the manufacturer places the vehicle on large rollers called dynamometers. The vehicle then performs a specific series of maneuvers dictated by federal regulations.

29.    The emissions control software gave FCA the ability to detect emissions testing conditions by monitoring steering wheel position, duration of operation, barometric pressure, and acceleration. When the software detects that the vehicle is on a dynamometer and that these inputs have registered at the levels or positions used for EPA emissions testing, the vehicle's software downgrades the engine's power and performance and runs the full emissions control systems to produce emissions results that meet EPA standards.

30.    When the software detected that the emission testing was complete, the EDC software then switched to a different calibration that caused the engine to return to full performance while reducing the performance of the emissions control systems. As a result, the vehicle was then allowed to emit illegal amounts of emissions during regular operation

on the road. In other words, when the vehicle is not being tested, the software runs a different system that reduces and "defeats" the effectiveness of the emission control system.

C.    **FCA and Bosch intentionally concealed the excessive and illegal levels of emissions emitted from the Affected Vehicles.**

31.    Although FCA advertised its EcoDiesel vehicles as meeting emissions standards and providing superior fuel economy while also offering high performance, FCA and Bosch did not, in fact, design a vehicle that had these desirable attributes. Instead, FCA and Bosch created a software device to hide the excessive and illegal levels of emissions of the Affected Vehicles. This software is illegal.

32.    The Clean Air Act has strict emissions standards for vehicles. It requires that vehicle manufacturers certify to the EPA that their vehicles sold in the U.S. meet the federal emissions standards to control air pollution. Each vehicle sold in the U.S. must obtain an EPA certificate of conformity or "COC."

33.    The Clean Air Act prohibits defeat devices. Under the Act, a "defeat device" is defined as any auxiliary emission control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." 40 C.F.R. § 86.1803-01; *see also id.* § 86.1809-10 ("No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device."). The Clean Air Act also prohibits the sale of components that can be used as defeat devices, "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." 42 U.S.C. § 7522(a)(3).

34.    To obtain a COC from the EPA, vehicle manufacturers must submit an application with a list of all auxiliary emission control devices installed in the vehicle, the justification for each, and an explanation of why the device is not a defeat device.

35.    In order to obtain the COCs necessary to sell the Affected Vehicles, FCA and Bosch did not disclose — and, in fact, affirmatively concealed — the software code that it

developed with Bosch to detect testing conditions and alter vehicle performance. In essence, FCA and Bosch lied to the government, customers, dealers, and the public at large about the Affected Vehicles' emission control systems.

36.     Because FCA and Bosch fraudulently obtained the COCs, and because the Affected Vehicles did not comply "in all material respects" to the COC application specifications, the Affected Vehicles were never covered by a valid COC. Accordingly, the Affected Vehicles were never legal for sale, nor were they EPA compliant, as FCA and Bosch represented. FCA and Bosch concealed these facts from the EPA, other regulators (like the California Air Resources Board, or "CARB"), its dealers and consumers, and the public at large. Additionally, FCA continued to sell and lease the Affected Vehicles, despite their illegality, with the complicity of Bosch.

37.     By manufacturing and selling cars with "defeat devices" that allowed higher emissions levels than it represented to the EPA, FCA violated the Clean Air Act, defrauded its consumers and dealers, and engaged in unfair competition under state and federal law.

38.     FCA's illegal software workaround was made possible by its close partnership with Bosch, which received a substantial portion of its revenue from manufacturing parts used in FCA's and other carmakers' diesel vehicles.  Bosch was not only aware that FCA used Bosch's emissions control components as a defeat device — Bosch worked *with* FCA to develop the software code specifically designed for the Affected Vehicles.

39.     This deception was revealed on January 12, 2017 when the EPA issued a Notice of Violation ("Notice") to FCA. (Exhibit A) This Notice explains that FCA has created and installed sophisticated software in the Affected Vehicles sold by FCA in the United State. The Notice goes on to describe how this software caused the Affected Vehicles to perform differently when the vehicle is being tested for emissions compliance than during normal operation and use. The Notice states that this software may be a "defeat device" as defined by the Clean Air Act.

40.     In addition to the EPA Notice of Violation, the FCA defendants have also received subpoenas from U.S. federal and state authorities, including the Securities Exchange

Commission, related to the "defeat device" software. The U.S. Department of Justice is also investigating the matter on a referral from the EPA.

D.    **FCA and Bosch profited from FCA's diesel vehicles while causing substantial harm to Plaintiff and class members.**

41.    FCA charged a substantial premium for its EcoDiesel vehicles as compared to non-diesel vehicles. For example, opting for the EcoDiesel engine for the 2016 Jeep Grand Cherokee Limited adds $4,500 to the MSRP.[20] Similarly, selecting this option for the 2016 Ram 1500 Crew Cab SLT increases MRSP by $4,270.[21] FCA charged these and similar price premiums for all vehicles containing "defeat devices." By charging these fraudulent price premiums, FCA was unjustly enriched.

42.    FCA and Bosch's illegal scheme duped thousands of U.S. consumers into buying Affected Vehicles that should never have been on the market, at a cost of billions of dollars. Similarly, vehicle dealers like Plaintiff and the other class members were duped into acquiring the Affected Vehicles through purchase and trade-ins for the purpose of resale to equally unwitting customers. Automobile dealers like Plaintiff and the class members were willing to pay a premium for these vehicles because of FCA's vehicles' popularity with American consumers — in particular, the popularity of the affected vehicles.

43.    Even if FCA and Bosch recall the Affected Vehicles and repairs them to disable the "defeat device" so that the vehicles comply with EPA emissions standards at all times, purchasers of these vehicles (including both consumers and reseller dealers) have and will continue to suffer substantial harm.

44.    First, FCA and Bosch are not able to make the Affected Vehicles comply with emissions standards without substantially reducing their performance characteristics,

---

20      *2016 Jeep Grand Cherokee Pricing* (with EcoDiesel option selected), Kelley Blue book, https://www.kbb.com/jeep/grand-cherokee/2016/limited/?vehicleid=415243&intent=buy-new&options=7039022|true (last accessed March 13, 2017).

21      *2016 Ram 1500 Crew Cab Pricing* (with EcoDiesel option selected), Kelley Blue book, https://www.kbb.com/ram/1500-crew-cab/2016/slt/?vehicleid=415017&intent=buy-new&category=pickup&options=7006177|true (last accessed March 13, 2017).

including their horsepower, torque, towing capacity, and fuel efficiency. Presumably, if FCA and Bosch could have designed a low-emission and high performance vehicle as advertised, they would have done so without engaging in the massive fraudulent scheme that has now been exposed. As a result, even if FCA and Bosch are able to make the vehicles in class members' inventory EPA-compliant through recalls and repairs, Plaintiff and class members will nonetheless suffer actual harm and damages because the vehicles will no longer perform as they did when purchased and as advertised.

45.     Second, FCA and Bosch's deception and the subsequent recall repairs will diminish the value of every Affected Vehicle. Plaintiff and other class members each overpaid for cars that are now worth substantially less. Whether FCA and Bosch are able to remedy the emissions problems through recalls and repairs or not, Plaintiff and class members will be forced to list and sell the affected vehicles for substantially less than if the vehicles worked as initially promised. This will result in lost profits to each class member. Additionally, the class members may be unable to resell these vehicles at all.

46.     Third, Plaintiff and other class members have encountered or will encounter additional costs associated with keeping unsold (and virtually unsellable) Affected Vehicles in their inventory, including transportation costs, registration and licensing, maintenance, and other costs and fees.

47.     Had Plaintiff Chatom Motor Company, Inc. and the other class members known of the "defeat device" at the time they acquired these vehicles with the intent to resell them, they would not have purchased the vehicles for resale, or would have paid substantially less for the vehicles than they actually did.

48.     Moreover, when and if FCA and Bosch recall the vehicles and downgrade the EcoDiesel engine performance in order to make the vehicles compliant with EPA emissions standards, Plaintiff Chatom Motor Company, Inc. and the other class members will suffer lost profits because they will be required to resell the vehicles for a substantially lower price, if they are able to resell the vehicles at all.

49.    As a result of FCA and Bosch's unfair, deceptive, and fraudulent business practices, and their failure to disclose that their EcoDiesel vehicles emit many times the allowable emissions levels under normal driving conditions, reseller dealers of the vehicles have suffered substantial losses. Affected Vehicles will necessarily be worth less in the used marketplace because of their decrease in performance and efficiency, which means that resellers will be unable to recover nearly as much value when reselling these vehicles, or will be unable to resell the vehicles and will be forced to incur the costs of keeping and maintaining the vehicles.

**E.    Plaintiff, Chatom Motor Company, Inc. and all other similarly situated persons have been damaged and will continue to be damaged by FCA and Bosch's conduct.**

50.    Plaintiff Chatom Motor Company, Inc., a citizen of Alabama, purchased a preowned 2015 Ram 1500 EcoDiesel from Ally SmartAuction for $31,775. Plaintiff Chatom Motor Company, Inc. also paid a $665 transportation fee associated with this purchase.

51.    Plaintiff Chatom Motor Company, Inc. would not have purchased this 2015 Ram 1500 EcoDiesel at auction at all, or would have paid substantially less to purchase it, had it been aware of the defeat device.

52.    If recalled, Chatom Motor Company, Inc. will suffer lost profits because Chatom Motor Company, Inc. will be required to resell the 2015 Ram 1500 EcoDiesel at a much lower price, if Chatom Motor Company, Inc. is able to resell the vehicle at all.

## CLASS ACTION ALLEGATIONS

53.    Plaintiff Chatom Motor Company, Inc. brings this action on behalf of itself and as a class action under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), on behalf of the following class:

> All automobile dealers in the United States with one or more previously owned "EcoDiesel" vehicle in inventory on or after January 12, 2017. These vehicles include, but are not necessarily limited to, Model Year 2014–2016 Dodge Ram 1500 and Model Year 2014–2016 Jeep Grand Cherokee.

Excluded from the class are the FCA and Bosch Defendants, their subsidiaries, affiliates, employees, legal representatives, and officers; all persons who make a timely election to be excluded from the (b)(3) class; automobile dealerships affiliated with defendants FCA and Bosch; governmental entities; any District, Magistrate or Appellate judge to whom this case is assigned and his/her immediate family and judicial staff; and any attorney representing Plaintiff in this action. Plaintiff reserves the right to revise the class definition based upon information learned through discovery.

54.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims.

55.    This action has been brought and may be properly maintained on behalf of the class proposed herein under Federal Rule of Civil Procedure 23 and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

## Class Certification Requirements

56.    *Numerosity: Federal Rule of Civil Procedure 23(a)(1).* The class members are so numerous and geographically dispersed that individual joinder of all class members is impracticable. Approximately 100,000 Affected Vehicles were sold in the U.S. between 2013 and 2017. The precise number of class members can only be ascertained through discovery, but the number is great enough that joinder is impracticable. On information and belief, hundreds, if not thousands, of class members exist. The court and all parties will benefit substantially from a single lawsuit that addresses all of the class members' claims in this case. Class members will be easily identifiable from information and records in FCA and Bosch's possession, custody, or control; from state vehicle registration records; or from other third parties. Class members may be notified of this action by recognized, court-approved methods of dissemination, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

57.     *Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).*
Common questions of law and fact in this case predominate over questions affecting
individual class members. Common factual and legal questions include, but are not limited
to:

(a)     whether FCA and/or Bosch engaged in the conduct alleged herein;

(b)     whether FCA and/or Bosch designed, advertised, marketed, distributed, leased,
sold, or otherwise placed vehicles with "defeat devices" into the stream of
commerce in the United States;

(c)     whether the Affected Vehicles contain a "defeat device" designed to allow the
vehicle to pass emissions tests but to violate emissions standards at other times;

(d)     whether FCA and/or Bosch knew or should have known about the "defeat
device" and, if so, how long FCA and/or Bosch have known or should have
known;

(e)     whether the true nature of the Affected Vehicles' performance, emissions levels,
fuel economy, and the inclusion of the defeat device constitute material facts
that reasonable consumers and/or reseller dealers would have considered in
deciding whether to purchase a Affected Vehicle and how much to pay for said
vehicle;

(f)     whether FCA and/or Bosch concealed the "defeat device";

(g)     whether FCA and/or Bosch made material misrepresentations about the
Affected Vehicles;

(h)     whether FCA and/or Bosch omitted material facts about the Affected Vehicles;

(i)     whether FCA and/or Bosch had a duty to disclose the true nature of the
Affected Vehicles to regulators and/or to Plaintiff and class members;

(j)     whether Defendants' concealment of the true nature of the Affected Vehicles
would have induced a reasonable consumer to act to their detriment by
purchasing and/or leasing the Affected Vehicles;

(k)     whether Defendants' concealment of the true nature of the Affected Vehicles
would have induced a reasonable reseller dealer to act to their detriment by
purchasing or acquiring the Affected Vehicles for resale;

(l)     whether any recall or repair will cause the Affected Vehicles to decrease in
value, decrease in performance, or require higher fuel consumption;

(m)   whether the Affected Vehicles can be made to comply with EPA and state emission standards without substantially reducing their performance and/or fuel efficiency;

(n)   whether Bosch supplied the "defeat device" to FCA with the knowledge that FCA would use it in production and manufacturing of the Affected Vehicles;

(o)   whether Bosch acted in concert with FCA and/or aided and abetted FCA's fraud;

(p)   whether Defendants' conduct violated RICO, fraud, warranty, and negligence laws, among others laws, as alleged herein;

(q)   whether Plaintiff and the other class members overpaid for the Affected Vehicles;

(r)   whether Plaintiff and the other class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief;

(s)   whether Plaintiff and the other class members are entitled to a declaratory judgment; and

(t)   whether Plaintiff and the other class members are entitled to damages and/or other monetary relief and, if so, in what amount.

58.   *Typicality: Federal Rule of Civil Procedure 23(a)(3).* Plaintiff's claims are typical of the other class members' claims because all class members were comparably injured through FCA and Bosch's wrongful conduct as described in detail above. Like Plaintiff Chatom Motor Company, Inc., all class members acquired an FCA vehicle designed, manufactured, marketed, and distributed by FCA and Bosch with a "defeat device" installed. Plaintiff and other class members purchased preowned Affected Vehicles from consumers and/or at auctions, or accepted the preowned Affected Vehicles from consumers as trade-ins. Like the Plaintiff, all class members have been damaged by FCA and Bosch's actions and will incur costs and loss of profits relating to the Affected Vehicles and the inclusion of the "defeat device." The factual bases of these claims are common to all class members.

59.   *Adequacy: Federal Rule of Civil Procedure 23(a)(4).* Plaintiff Chatom Motor Company, Inc. is an adequate class representative because its interests do not conflict with the interests of the other members of the class it seeks to represent. Plaintiff Chatom Motor

Company, Inc. has retained counsel who are competent and experienced in complex class action litigation. Moreover, Plaintiff Chatom Motor Company, Inc. intends to prosecute this action vigorously. Plaintiff Chatom Motor Company, Inc., and its counsel, will fairly and adequately protect the class's interests in this case.

60.     *Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2).* FCA and Bosch have acted or refused to act on grounds generally applicable to Plaintiff Chatom Motor Company, Inc. and the other members of the class. Accordingly, final injunctive relief and declaratory relief, as described below, is appropriate with respect to the class as a whole.

61.     *Superiority: Federal Rule of Civil Procedure 23(b)(3).* A class action is superior to any other available means for the fair and efficient adjudication of this case. No unusual difficulties are likely to arise in the management of this class action. The damages that Plaintiff and the other class members suffered are relatively small compared to the burden and expense required to litigate their claims individually against FCA and Bosch. Accordingly, it would be impracticable for class members to seek redress individually from FCA and Bosch for their wrongful conduct.

62.     Even if class members could afford the relatively high cost of individual litigation, the court system could not. Individual litigation creates the potential for inconsistent or contradictory judgments. It also increases the delay and expense to all parties and the court system. By comparison, a class-action presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

63.     Moreover, separate individual actions create the risk of different courts imposing different and incompatible standards of conduct on FCA and Bosch. This creates needless duplication and prolonged proceedings, and is inappropriate because common legal and factual questions predominate over individual questions.

## CAUSES OF ACTION
## COUNT I

**Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Against All Defendants)**
**18 U.S.C. § 1962(c)**

64.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

65.     Fiat Chrysler Automobiles N.V., FCA US LLC, Robert Bosch GmbH, and Robert Bosch LLC are each a "person" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

66.     FCA and Bosch violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the FCA RICO Enterprise through a pattern of racketeering activity.

67.     Plaintiff and class members are "person[s] injured in his or her business or property" by reason of FCA and Bosch's violation of the federal RICO statute within the meaning of 18 U.S.C. § 1964(c).

68.     For many years, the Defendants actively sought to increase their sales of the Affected Vehicles (and their components) in an effort to boost their revenues and profits, as well as to increase their market share of the diesel vehicle segment. Presumably finding it impossible to achieve these goals lawfully, however, the Defendants resorted to cheating through their fraudulent "defeat device" conspiracy.

69.     The Defendants, along with other entities and individuals, were employed by or associated with, and conducted or participated in the affairs of, one or several RICO enterprises, whose purpose was to deceive regulators, consumers, dealers, and the public at large into believing that the Affected Vehicles complied with emission standards and were "clean" and environmentally friendly in order to increase revenues and minimize losses from the design, manufacture, distribution and sale of the Affected Vehicles and the installed defeat devices. As a direct and proximate result of Defendants' fraudulent scheme and common course of conduct, Defendants obtained billions of dollars of revenue from Plaintiff and the class members. As explained in detail below, the Defendants' misconduct violated Sections 1962(c) and (d).

**The FCA RICO Enterprise**

70.    Upon information and belief, the following persons and entities, and others currently unknown, have been members of and constitute an "association-in-fact enterprise" under the meaning of RICO (collectively, "the FCA RICO Enterprise"):

(a)    Fiat Chrysler Automobiles N.V., FCA US LLC, Robert Bosch GmbH, and Robert Bosch LLC, who designed, manufactured, advertised, and sold over one hundred thousand vehicles with defeat devices knowing that the vehicles contained the defeat devices, the scope and nature of which they concealed from and misrepresented to the public, consumers, dealers, and regulators for years;

(b)    Fiat Chrysler Automobiles N.V., FCA US LLC, Robert Bosch GmbH, and Robert Bosch LLC's Officers and Executives, who have collaborated and colluded with each other and with other associates in the FCA RICO Enterprise to deceive Plaintiff and class members into purchasing or otherwise acquiring defective vehicles, and actively concealing the illegal defeat devices from Plaintiff and class members, regulators, consumers, and the general public;

(c)    Fiat Chrysler Automobiles N.V., FCA US LLC, Robert Bosch GmbH, and Robert Bosch LLC's Engineers, who designed the defeat device software and collaborated and colluded with each other and with other associates in fact in the FCA RICO Enterprise to deceive Plaintiff and class members into purchasing defective vehicles, and actively concealing the illegal defeat devices from Plaintiff and class members, regulators, consumers, and the general public; and

(d)    Other third-party persons and entities that knowingly assisted FCA and Bosch's development, testing, and production of the hardware and software that functioned as the defeat device.

71.    The FCA RICO Enterprise engaged in both interstate and foreign commerce, and its unlawful activities affected both interstate and foreign commerce. The FCA RICO Enterprise is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4), consisting of "persons" associated together for a common purpose. The FCA RICO Enterprise had an ongoing organization with an ascertainable structure and functioned as a continuing unit with separate roles and responsibilities.

72.    While Fiat Chrysler Automobiles N.V., FCA US LLC, Robert Bosch GmbH, and Robert Bosch LLC's, and other members of the FCA RICO Enterprise participated in the

conduct of the FCA RICO Enterprise, they each had an existence separate and distinct from the FCA RICO Enterprise.

73.     At all relevant times, Defendants operated, controlled, or managed the FCA RICO Enterprise, through a variety of actions. The participation of Fiat Chrysler Automobiles N.V., FCA US LLC, Robert Bosch GmbH, and Robert Bosch LLC, and others in the FCA RICO Enterprise was necessary for the successful operation of the Defendants' defeat device scheme because Fiat Chrysler Automobiles N.V., FCA US LLC, Robert Bosch GmbH, and Robert Bosch LLC, and other members of the FCA RICO Enterprise manufactured the Affected Vehicles and their components, concealed the nature and scope of the defeat devices, or profited from their concealment.

74.     The FCA RICO Enterprise's members all served a common purpose — to sell as many Affected Vehicles containing defeat devices as possible, maximizing the revenue and profitability of the FCA RICO Enterprise's members. The FCA RICO Enterprise's members shared the benefits generated by the enterprise by sharing the profits derived from increased sales revenue generated by the defeat device scheme.

75.     Each member of the FCA RICO Enterprise, including the Fiat Chrysler Automobiles N.V., FCA US LLC, Robert Bosch GmbH, and Robert Bosch LLC, benefited from this common purpose. Fiat Chrysler Automobiles N.V., FCA US LLC, Robert Bosch GmbH, and Robert Bosch LLC, and others sold more defeat device vehicles than they would have otherwise sold if the scope and nature of the defeat devices had not been concealed. Fiat Chrysler Automobiles N.V., FCA US LLC, Robert Bosch GmbH, and Robert Bosch LLC also sold or leased those vehicles at a much higher price as a result of the concealment of the defeat devices from Plaintiff and class members, regulators, consumers, and the general public.

## Pattern of Racketeering Activity

76.     Fiat Chrysler Automobiles N.V., FCA US LLC, Robert Bosch GmbH, Robert Bosch LLC, and other members of the FCA RICO Enterprise conducted and participated in the conduct of the affairs of the FCA RICO Enterprise through a pattern of racketeering

activity that consists of numerous and repeated violations of the federal mail and wire fraud statutes. These statutes prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

77.    For FCA and Bosch, the purpose of the defeat device scheme was to conceal the scope and nature of the illegal defeat devices installed in over one hundred thousand Affected Vehicles in order to sell more vehicles, to sell them at a higher price and/or for a higher profit, and to avoid the expenses associated with repairing the defects. By concealing the illegal defeat devices installed in the Affected Vehicles, FCA and Bosch also maintained and boosted consumer and reseller confidence in the EcoDiesel technology, and avoided recall and repair costs and negative publicity, all of which furthered the scheme to defraud and helped FCA and Bosch sell more Affected Vehicles than they otherwise would have sold, and to sell these vehicles at a much higher price or for a higher profit.

78.    As described above, FCA and Bosch were fully aware of the defeat devices, but intentionally subjected Plaintiff and class members, as well as consumers, to the defeat devices to maximize their own profits. Additionally, since the defeat devices became known, Fiat Chrysler Automobiles N.V., FCA US LLC, Robert Bosch GmbH, and Robert Bosch LLC have failed to adequately remedy the defect.

79.    To further their scheme to defraud, FCA and Bosch misrepresented and concealed the defeat devices from federal regulators, enabling FCA and Bosch to escape the investigation and costs associated with recalls and repairs.

80.    To further their scheme to defraud, FCA and Bosch promoted and touted the quality and performance of the Affected Vehicles while simultaneously concealing the nature and scope of the defeat devices.

81.    To carry out, or attempt to carry out, their scheme to defraud, FCA and Bosch have conducted the affairs of the FCA RICO Enterprise through the following pattern of racketeering activity that employed the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

   a.    FCA and Bosch devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means

of mail and wire communication travelling in interstate or foreign commerce, writing(s) and/or signal(s), including FCA and Bosch websites, communications with the EPA and/or CARB, statements to the press, and communications with other members of the FCA RICO Enterprise, as well as advertisements and other communications to FCA and Bosch's customers, including Plaintiff and class members, as well as consumers and the general public. Given that each Affected Vehicle required a COC application to the EPA, FCA and Bosch used the mail and wires numerous times to submit the fraudulent COC applications; and

b.  FCA and Bosch utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the concealment, omissions, false pretense, and misrepresentations described above.

82.  FCA and Bosch's pattern of racketeering activity in violation of the mail and wire fraud statutes included transmitting or causing to be transmitted, by means of mail and wire communication traveling in interstate or foreign commerce, between their offices in Michigan or among the other numerous offices in the United States and internationally, communications concerning the illegal defeat devices and COC application submissions to the EPA for each model and year of the Affected Vehicles that failed to adequately disclose, describe, or address all auxiliary emission control devices that were installed in the Affected Vehicles. FCA and Bosch's conduct in furtherance of this scheme was intentional. Plaintiff and class members, as well as consumers, were directly harmed as a result of Fiat Chrysler Automobiles N.V., FCA US LLC, Robert Bosch GmbH, and Robert Bosch LLC's intentional conduct. Plaintiff, class members, consumers, the general public, and federal regulators relied on FCA and Bosch's material misrepresentations and omissions.

83.  FCA and Bosch engaged in a pattern of related and continuous predicate acts beginning at least in 2013. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiff and class members, consumers, regulators, and the public at large, and obtaining significant profits and revenues from purchasers while providing consumers with Affected Vehicles with defeat devices installed,

which are worth significantly less than the purchase price paid. These Affected Vehicles were then resold and passed on to Plaintiff and other class members at an inflated price. These predicate acts were related and were not isolated events.

84.    These predicate acts all had the purpose of generating significant revenue and profits for FCA and Bosch at the expense of Plaintiff and class members, as well as consumers. The predicate acts were committed or caused to be committed by FCA and Bosch through their participation in the FCA RICO Enterprise and in furtherance of its fraudulent scheme. These acts were interrelated in that they each involved wrongfully obtaining funds from purchasers of the Affected Vehicles, as well as avoiding the expenses associated with recalling and repairing the defeat device defect.

85.    As a result of FCA and Bosch's conduct, and in particular their pattern of racketeering activity, Plaintiff and class members, as well as consumers, have been injured in their business and/or property in numerous ways including, but not limited to:

a.    purchasing and offering for resale preowned vehicles with defeat devices that Plaintiff and class members would not otherwise have purchased or offered for resale;

b.    diminished value of the vehicles with defeat devices purchased by Plaintiff and class members, which reduces the vehicles' resale value; and

c.    additional costs associated with carrying and maintaining vehicles with defeat devices that Plaintiff and class members are unable to resell to consumers because of the defeat devices.

86.    FCA and Bosch's violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiff and class members. Accordingly, Plaintiff and class members are entitled to bring this action for three times their actual damages, injunctive and/or equitable relief, and costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT II

### Fraud by Concealment (Against All Defendants)

87.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

88.     FCA and Bosch intentionally designed the "defeat device" to circumvent the requirements of the Clean Air Act. FCA and Bosch falsely certified to the EPA that the Affected Vehicles were in compliance with the EPA's requirements. At the same time, FCA and Bosch intentionally marketed and advertised the Affected Vehicles as "green," "clean," and "environmentally-friendly" and described and branded the engine as an "EcoDiesel" engine.

89.     Plaintiff and class members reasonably relied on FCA and Bosch's false representations regarding the environmentally-friendly, low-emissions, and high-performance nature of the "EcoDiesel" vehicles when deciding to purchase these vehicles or accept them as trade-ins for resale. Plaintiff and class members had no way of knowing that FCA and Bosch's representations were false and misleading. Because of FCA and Bosch's efforts to conceal the true nature of the Affected Vehicles, Plaintiff and class members did not, and could not, discover FCA and Bosch's deception on their own.

90.     FCA and Bosch's false representations were material to consumers, not only with respect to the quality of the Affected Vehicles (including their compliance with applicable federal and state laws and regulations regarding clean air and emissions), but also because FCA and Bosch's representations regarding the quality of the Affected Vehicles significantly impacted their value. FCA and Bosch were aware that their consumers, as well as Plaintiff and class members, paid a premium for these vehicles based on FCA and Bosch's representations regarding their quality.

91.     FCA and Bosch had a duty to disclose the truth about the defeat device installed in the Affected Vehicles to potential and actual consumers, as well as to the EPA and other regulators, because this information was known only to FCA and Bosch and because FCA and Bosch knew that consumers and regulators could not otherwise discover this information. FCA and Bosch breached this duty in order to profit at the expense of Plaintiff,

the other class members, consumers, and the public, who were also put at risk from the elevated emissions levels.

92.    FCA and Bosch have likely still not made full and adequate disclosures regarding the nature of the Affected Vehicles and the installed defeat devices. Accordingly, FCA and Bosch likely continue to defraud Plaintiff and class members, as well as consumers, by concealing material information regarding the Affected Vehicles, the defeat device, and FCA and Bosch's deception scheme.

93.    Plaintiff and class members were not aware, and could not have been aware, of the material facts omitted and concealed by FCA and Bosch. Had Plaintiff and the other class members known the true nature of FCA and Bosch's "EcoDiesel" vehicles, they would not have purchased the "EcoDiesel" vehicles or offered them for resale, would not have paid as much as they did for those "EcoDiesel" vehicles, and/or would have taken other affirmative steps upon considering the information that was wrongfully concealed from them.

94.    As a result of FCA and Bosch concealed and suppressed these material facts, Plaintiff and class members have sustained substantial damages.  Because of FCA and Bosch's concealment of the true nature of the Affected Vehicles' emissions, as well as FCA's failure to timely disclose those facts to Plaintiffs and the class members, the "EcoDiesel" vehicles purchased or accepted as trade-in for resale by the Plaintiff and other class members are now substantially diminished in value. Accordingly, Plaintiff and class members overpaid for the Affected Vehicles. Plaintiff and class members would have paid substantially less for the Affected Vehicles, or would not have acquired them at all, if they had been aware of the actual nature of the Affected Vehicles and FCA and Bosch's deception.

95.    As a result of the Affected Vehicles' diminished value, Plaintiff and other class members will be unable to re-sell the FCA "EcoDiesel" vehicles currently in their inventories, or will only be able to do so at a substantially reduced price, causing Plaintiff and other class members lost profits.

96.    Accordingly, FCA and Bosch are liable to Plaintiff and class members for damages in an amount to be proven at trial.

97.    With respect to the conduct described above, FCA and Bosch acted wantonly, maliciously, deliberately, intentionally, and with reckless disregard to the rights of Plaintiff and the other class members. These acts were done with the sole purpose of unjustly enriching FCA and Bosch at the expense of Plaintiff and class members. Accordingly, an assessment of punitive damages in an amount sufficient to deter such conduct in the future is warranted. This amount is to be determined at trial.

**COUNT III**

**Failure to Recall/Retrofit**

98.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

99.    FCA and Bosch designed, manufactured, marketed, distributed, sold, and otherwise placed in the stream of U.S. commerce the Affected Vehicles, as described above.

100.    FCA and Bosch knew or should have known that, because of the defeat device software, at the time the Affected Vehicles were placed in the stream of U.S. commerce the Affected Vehicles would be defective when used by consumers in a reasonably foreseeable manner.

101.    FCA and Bosch failed to recall and repair the Affected Vehicles in a timely manner. FCA and Bosch further failed to warn consumers or Plaintiff and the class members of the Affected Vehicles' defects — namely, the presence of the defeat device software.

102.    A reasonable vehicle manufacturer in same or similar circumstances would have timely and properly recalled and repaired the Affected Vehicles. FCA and Bosch's failure to recall the Affected Vehicles was a substantial factor in causing the harm (including the extent of the harm) to Plaintiff and the class. If the defeat device defect had been timely disclosed and the Affected Vehicles appropriately recalled in a timely manner, Plaintiff and the class members would not have purchased the Affected Vehicles for resale. Plaintiff and the class members would have instead invested their money in other vehicles.

103.    Because the Affected Vehicles have not been properly recalled, they remain illegal, defective, and virtually unsellable. Plaintiff and other class members have been unable to resell these vehicles, or have only been able to do so at a substantial loss.

## COUNT IV

### Unjust Enrichment (Against All Defendants)

104.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

105.    FCA and Bosch have benefitted from selling the Affected Vehicles at an unjust profit. The value of the Affected Vehicles was artificially inflated by Defendants' misrepresentations regarding the emissions, performance, and fuel-efficiency of the Affected Vehicles and their concealment of the defeat device. As a result, Plaintiff and class members have overpaid for the vehicles, conferring a benefit on FCA and Bosch.

106.    FCA and Bosch have retained this benefit. FCA and Bosch know of and appreciate this benefit. They were and continue to be unjustly enriched at the expense of Plaintiff and class members.

107.    It is inequitable and unconscionable for Defendants to retain this benefit. Accordingly, FCA and Bosch should be required to disgorge this unjust enrichment.

## COUNT V
### Breach of Express Warranty (Against All Defendants)

108.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

109.    FCA and Bosch have expressly warranted that the Affected Vehicles comply with EPA emission standards, as well as other applicable laws and regulations, including CARB and other state emissions standards.

110.    FCA and Bosch's express warranty that the Affected Vehicles comply with state and federal emission standards appears on FCA's website, advertising materials, vehicle manuals, and instructional and other materials.

111.   Plaintiffs and class members reasonably relied on FCA and Bosch's representations in purchasing or accepting as trade-ins preowned EcoDiesel vehicles for resale. Those vehicles, however, do not perform as was warranted.

112.   Unbeknownst to Plaintiff and the class members, those vehicles included defeat devices that caused their emission reduction systems to perform at worse levels than advertised. Those defeat devices are defects. FCA and Bosch affirmatively concealed that defect from Plaintiff and class members, consumers, regulators, and the general public. Accordingly, FCA and Bosch breached their express warranty by providing a product containing defects that were never disclosed to the Plaintiffs and Class members.

113.   Plaintiff and other class members paid for vehicles that complied with state and federal emissions standards. Because these vehicles do not, in fact, conform to EPA and other regulatory standards, however, Plaintiff and other class members have not obtained the full value of the vehicles as advertised and promoted. If Plaintiff and other class members had known the true nature of the Affected Vehicles, including the defeat devices, they would not have purchased or otherwise acquired those vehicles for resale.

114.   As a result of FCA and Bosch's breach of express warranty, Plaintiff and the class members are entitled to recover compensatory damages, declaratory relief, and other relief as described herein.

## COUNT VI
### Breach of Implied Warranties of Merchantability and Fitness for a Particular Purpose
### (Against All Defendants)

115.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

116.   FCA and Bosch made numerous representations, descriptions, and promises to Plaintiff and class members, consumers, regulators, and the general public regarding the functionality of the Affected Vehicles' "clean" diesel technology.

117.   Plaintiff and class members reasonably relied on FCA and Bosch's representations in purchasing or accepting as trade-ins "EcoDiesel" vehicles for resale.

118.    FCA and Bosch knew that their representations, descriptions and promises regarding the Affected Vehicles were false.

119.    When Plaintiff and class members purchased FCA's diesel vehicles, the vehicles did not conform to the promises or affirmations of fact FCA and Bosch made in promotional materials, including that the vehicles were designed to meet EPA and other applicable regulatory standards. Instead, as alleged above, those vehicles were designed to evade those standards, and the vehicles emitted far higher levels of pollution than promised.

120.    Accordingly, these vehicles failed to conform to FCA and Bosch's implied warranty regarding their functionality.

121.    As a direct and proximate result of FCA and Bosch's false and misleading representations and warranties, Plaintiff and class members suffered substantial injury. Plaintiff and the class members paid a premium price when purchasing or accepting the Affected Vehicles as trade-ins. Because of FCA and Bosch's conduct, these vehicles are now worth far less than the price Plaintiff and class members paid.  Plaintiff and the class members will now only be able to sell these vehicles for a substantially reduced price, if at all.

122.    As a result of FCA and Bosch's breach of implied warranty, Plaintiff and the class members are entitled to recover compensatory damages, declaratory relief, and other relief as described herein.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all class members, respectfully requests that the Court enter judgment in its favor and against Fiat Chrysler Automobiles N.V., FCA US LLC, Robert Bosch GmbH, and Robert Bosch LLC as follows:

A.    Certification of the proposed class, including appointment of Plaintiff's counsel as class counsel;

B.    An order temporarily and permanently enjoining Fiat Chrysler Automobiles N.V., FCA US LLC, Robert Bosch GmbH, and Robert Bosch LLC from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.      Injunctive relief in the form of a recall or free replacement program;

D.      Costs, restitution, damages, and disgorgement in an amount to be determined
        at trial;

E.      Other damages as permitted by applicable laws;

F.      Pre- and post-judgment interest on any amounts awarded;

G.      Costs and attorneys' fees; and

H.      Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial.

DATED:  March 16, 2017

By: _____
R. Edward Massey, Jr. (MASSE4348)
CLAY, MASSEY & ASSOCIATES, P.C.
509 Church Street
Mobile, Alabama 36602
251- 433-1000


Stacey Slaughter (*pro hac vice to be filed*)
Kaitlyn Johnson (*pro hac vice to be filed*)
ROBINS KAPLAN LLP
800 LaSalle Avenue
Suite 2800
Minneapolis, MN  55402
612 349 8500

**Attorneys for Plaintiff**

PLEASE SERVE DEFENDANTS BY CERTIFIED MAIL, AS FOLLOWS:

FCA US, LLC
CT Corporation System
2 North Jackson Street, Ste. 605
Montgomery, Alabama 36104

Robert Bosch, LLC
Corporation Service Company
2711 Centerville Road, Ste. 400
Wilmington, DE 19808